(No. 5916.   October 3, 1933.)

In the Matter of the Estate of FRANK JOSEPH HENGY, Deceased.   JOSEPH HENGY, MARY HENGY STEWART, CATHERINE ROBERTSON, LILLIE JOSEPHINE TUCKER, LOUISE L. KISSEL, XAVIER HENGY and LOUISE HENGY, Appellants, v. LOUISE WALTER and MADELINE WALTER, as Executrices of the Will and Estate of FRANK JOSEPH HENGY, Deceased, LOUISE WALTER, MADELINE WALTER, LOUISE WALTER LITCHFIELD, EMILY WALTER ZINN, MARIE WALTER HOWARD and EUGENE GASSER.

[26 Pac. (2d) 178.]

George Erb and Tannahill & Durham, for Appellants.

Cox, Martin & Ware, for Respondents.

HOLDEN, J.—Frank Joseph Hengy came to the United States from Alsace Lorraine about the year 1872, first locating in Pennsylvania, where he married Josephine Frisch in 1873, later moving to Dallas, Texas. Seven children were born of that marriage and all are living. In 1901 he secured a divorce from Josephine Frisch Hengy, and a year afterward married Louise Frisch Gasser, a sister of his former wife. No children were born of that marriage. The second wife, Louise Frisch Hengy, died testate in March, 1926. By the terms of her will she made her two children by a former marriage, Eugene Gasser and Louise Gasser Walters, sole beneficiaries. Shortly after her will was filed for probate a controversy arose between the Gasser children and the deceased as to the character and value of the community interest of their mother in the Hengy property. To settle the controversy, the deceased purchased the interest of the two Gasser children by giving each one his note for $6,000. Later the deceased became dissatisfied with the

settlement made with those children, and as a result, wanted the amount of the settlement reduced, which the children refused, and which refusal led the aged man to believe he had been "robbed" in the settlement. September 11, 1926, the deceased executed an instrument claimed by respondents to be his last will and testament. Later, and on December 13, 1927, he wrote his son, Joseph, the following letter:

"Lewiston Dec 13th 1927

"Joseph Hengy Dallas Texas

"Dear Son. I received your cristmass and Newyears cart. but I never got a letter you. since my Last letter I wrote you in wich I wrote you to let me know about how much money I took away from Dallas and invested in Lewiston Idaho. I tink you will remember how much I took from the Dallas Bank when me and your Brother Xavier left Dallas. I know you was by me in the Dallas Bank when I took the money. you also know yow much I left when I made the trip to the Old Country. about much was send to me. also how much I got from the M.K.T. railroad co. and how much my part Came to me. When your mother died also how much I got from the Old Homestead. also what ever you tink about. all to gether the money I got from Dallas Gene Gassar made me sign two Bank Checks while I was sick with the influenza so I would have to pay to Gene $6000oo and to Mrs. Louise Walters $6000oo so I like to have you no what they Claim. If any thing should happen to me Joe. you will find all my papers in the Cellar in my iron Box and all my money and property belongs to my own Children. they will find out I have some thing yet to say, that Walter family are robbing me of everything. Let me know what you think about all of It. Well i send my best regards to all.

"Your Father

"F. J. Hengy 1702 Main Str

"Lewiston, Idaho"

That letter was entirely written, dated and signed by the hand of the deceased.

October 7, 1930, Frank Joseph Hengy died, being about 78 years of age. October 28, 1930, the said instrument dated September 11, 1926, was admitted to probate by the probate court of Nez Perce county. May 14, 1931, a petition to revoke the probate of said instrument was filed in said probate court by the children of the deceased, the appellants here. June 5, 1931, the probate court denied and dismissed the said petition. July 29, 1931, the children of the deceased appealed to the district court for Nez Perce county. January 14, 1932, counsel for the respective parties stipulated in writing that the said district court try the second cause of contest set forth in such petition to revoke the probate of said alleged will, and determine whether the said letter constitutes a will. January 18, 1932, the cause was tried by the court, sitting without a jury. May 12, 1932, it was adjudged that said letter was not written with testamentary intent and is not a will and that it does not revoke the said alleged will admitted to probate, as above stated. The appeal is from that judgment.

Appellants seek a reversal of the judgment of the trial court upon the grounds that the court erred in finding and adjudging that the above-quoted letter was not written by the deceased with testamentary intent and that the same is not a will and that it did not revoke the alleged will admitted to probate, and in failing to find upon all of the contents of said letter, particularly that portion of the letter which follows the inquiries of the deceased in relation to the amount of money he brought to Idaho from Texas, the amount he received from the "M.K.T." railroad company and the checks given to Gene Gasser and Louise Gasser Walters, stepchildren of the deceased.

The decisive questions on this appeal are: 1. Does the said letter written by the deceased to his son, Joseph, December 13, 1927, meet the requirements of section 14–304, I. C. A.? And 2. Did the deceased write that letter with testamentary intent?

Section 14–304, I. C. A., reads as follows:

"An olographic will is one that is entirely written, dated and signed by the hand of the testator or testatrix (who may be either married or unmarried). It is subject to no other form, and may be made in or out of this state, and need not be witnessed.

It thus appears that the statute makes but three requirements of an olographic will: First: That it be entirely written by the hand of the testator. Second: That it be dated by the hand of the testator; and Third: That it be signed by the hand of the testator. The letter, therefore, satisfies every requirement of the statute applicable to the proper execution and proof of an olographic will.

Turning now to the question as to whether the above-quoted letter was written by the deceased with testamentary intent, we direct attention to the following cases, which seem to us to be both helpful and instructive in determining the intent of the deceased in writing the letter. In *Nichols v. Emery,* 109 Cal. 323, 41 Pac. 1089, 50 Am. St. 43, the supreme court of California says:

"It is undoubtedly the general rule enunciated by the leading case of *Habergham vs. Vincent,* 2 Ves. Jr. 231, and oft repeated, that the true test of the character of an instrument is not the testator's realization that it is a will, but his intention to create a revocable disposition of his property, to accrue and take effect only upon his death, and passing no present interest. The essential characteristic of an instrument testamentary in its nature is that it operates only upon and by reason of, the death of the maker. Up to that time it is ambulatory. By its execution the maker has parted with no rights, and divested himself of no modicum of his estate; and, *per contra,* no rights have accrued to, and no estate has vested in, any other person. The death of the maker establishes for the first time the character of the instrument. It at once ceases to be ambulatory. It acquires a fixed status, and operates as a conveyance of title. Its admission to probate is merely a judicial declaration of that status."

In *Merrill v. Boal*, 47 R. I. 274, 132 Atl. 721, 725, 45 A. L. R. 830, the court says:

"A person may act *animo testandi* without knowing that he is making a will, and it is immaterial what kind of an instrument he thinks he is making, if only he manifests a clear intent to dispose of his property after his decease and observes the statutory formalities."

The supreme court of Montana in *Barney v. Hayes*, 11 Mont. 571, 29 Pac. 282, 284, 28 Am. St. 495, states:

"The only question remaining is whether it is testamentary in character. A decision of this point was reserved on the former appeal of this case. 'A will is an instrument by which a person makes a disposition of his property, to take effect after his decease.' 1 Jarm. Wills, 26, and notes. 'A last will and testament may be defined as the disposition of one's property to take effect after death.' 1 Redf. Wills, 5. 'Swinburne defines a "testament" to be a "just sentence of our will, touching that we would have done after our death." *Turner v. Scott*, 51 Pa. St. 132. Woerner, in the American Law of Administration, expresses the same views. Chapter 5. The decedent in this case, in the letter in question, announces his marriage, and then writes: "What I want is for you to change my will so that she (his wife) will be entitled to all that belongs to her as my wife. I am in very poor health, and would like this attended to as soon as convenient. I don't know what the laws are in Montana. I don't know what ought to be done, but you do." ' Do these words disclose an *animus testandi?* The writer expresses his wish that his wife shall have something. The reasonable construction of the letter is that he wished her to have a certain portion of his estate after his death. His intent may be expressed by the word 'want' which he uses, or 'wish,' or 'desire,' as well as by the words 'command' or 'direct.' *Busby vs. Lynn*, 37 Tex. 150. To be sure, what the decedent wrote was that he 'wanted his will changed.' It is argued that it was not changed. But did not this letter change it? The original will was the expression of his intention, on June 15, 1889,

as to the disposition of his property after death. That was his 'will' using that word in its original sense of 'intent,' 'desire,' or 'command.' Now, on August 18, 1890, he had another 'will' or 'intent' or 'desire.' That later 'will' or 'intent' or 'desire' he clearly expressed in his letter of that date. That letter was, using the old definition, 'his just sentence of his will touching what he would have done after his death.' Can anyone read the decedent's letter and be in any doubt as to what he intended should be the disposition of his property as to his wife? We think not. Such holographic will need not be in any particular form, Section 439, Prob. Prac. Act. If the decedent's intention is clear, that intent must not be ignored because the language is not technical."

Schouler, in his excellent work on Wills, 6th edition, p. 500, par. 426, has this to say:

"The test seems to be neither the knowledge of the deceased nor the technical wording of his statement, but whether the statement was an expressed desire of the disposition of property after death assuming the necessary formalities to have been observed."

Also see Williams on Executors, 11th Eng. ed., page 79, and Jarman on Wills (sixth edition), vol. 1, page 33.

We now come directly to the interpretation of the letter of December 13, 1927. Before that letter was written came the dispute between the stepchildren and the deceased over the interest of those children in the Hengy property, and the objection of the deceased to paying the notes given in settlement of that controversy, and the refusal of the children to reduce the amount of the settlement, which sheds much light on the frame of mind of the deceased while writing the letter. That at that time the heart and mind of the deceased were full of bitterness for the stepchildren cannot be doubted. That bitterness is very emphatically expressed by the deceased in these words: "That Walter family are robbing me of everything." With the evidently sincere feeling that he was being robbed, he turns from the stepchildren to the children of his own flesh and blood, and

says: "If anything happens to me Joe. you will find all my papers in the Cellar in my iron Box and all my money and property belongs to my own children." When the letter was written Mr. Hengy was about 78 years old. He had lived his allotted time, and consequently, must necessarily and at any time expect the final summons, and when that should come to him, it was his earnest and fervent wish and desire, to use his own language, that "all my money and property belongs to my own children"; in other words, he clearly expressed the intent that, upon his death, all his money and property should go to *his own children,* and for the purpose of making sure that no property would be overlooked, and that his children would get all of it at his death, he informed his son, Joe, that he would find all of his papers in the cellar in his iron box.

It is wholly immaterial as to whether the stepchildren did or did not take advantage of the deceased, and we are not intimating or holding that they did. In that connection, we are only interested in getting at the frame of mind of the deceased toward the stepchildren when he wrote the letter, for the light that sheds on his intent in writing the letter.

In conclusion, we hold that the letter of December 13, 1927, was written by the deceased with testamentary intent, and that it is an olographic will, and that it revoked the will made by the deceased September 11, 1926, and admitted to probate October 28, 1930.

Therefore, the judgment of the trial court is reversed and the cause remanded for further proceedings in harmony with the views expressed in this opinion. Costs to appellants, the same to be paid by the executrices out of the funds of the estate.

Budge, C. J., and Givens, Morgan and Wernette, JJ., concur.

Petition for rehearing denied